J-S42037-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| AHMED F. GAD | : | |
| | : | |
| Appellant | : | No. 788 EDA 2020 |

Appeal from the PCRA Order Entered February 12, 2020
in the Court of Common Pleas of Northampton County
Criminal Division at No(s): CP-48-CR-0003404-2017

BEFORE: PANELLA, P.J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                    Filed: November 25, 2020

Ahmed F. Gad ("Gad") appeals from the Order denying his first Petition for relief filed pursuant to the Post Conviction Relief Act ("PCRA"), *see* 42 Pa.C.S.A. §§ 9541-9546. We affirm.

On June 6, 2017, Gad was convicted, at docket number CP-48-CR-0003326-2016 ("No. 3326-2016"), of simple assault and harassment, arising out of an incident of domestic violence with his wife, Eva Fisher ("Fisher").[1] Prior to his trial at No. 3326-2016,

> [Gad] both intimidated [] Fisher in an effort to persuade her to commit perjury by testifying falsely that [Gad] did not assault her, and occasioned her absence from the first trial. In addition, [Gad] committed perjury at his first trial by testifying that he did not know [] Fisher's whereabouts, when[,] in fact[,] he knew precisely

---

[1] For a full recitation of facts underlying Gad's conviction at No. 3326-2016, see **Commonwealth v. Gad**, 190 A.3d 600 (Pa. Super. 2018).

where she was and had occasioned her absence from trial, and by falsely testifying that [Gad] did not assault [Fisher].

PCRA Court Order, 2/12/20, at 1-2.

As a result of this conduct, Gad was charged with perjury, criminal solicitation to commit perjury, and witness intimidation.[2] Gad was represented by James Connell, Esquire ("Attorney Connell"), during his jury trial. A jury found Gad guilty of all offenses. On March 2, 2018, the trial court sentenced Gad to an aggregate term of 40 to 180 months in prison, with credit for time served, plus fines. The trial court ordered Gad's sentence to run consecutive to the sentence imposed at No. 3326-2016. Gad filed a Motion for Reconsideration, which the trial court denied.

Gad filed a timely Notice of Appeal, but Attorney Connell failed to timely comply with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On review, this Court held that counsel's failure to file a Rule 1925(b) concise statement constituted *per se* ineffective assistance of counsel. **See Commonwealth v. Gad**, 201 A.3d 823 (Pa. Super. 2018) (unpublished memorandum at 5-6). Accordingly, the case was remanded for the trial court to file a Rule 1925(a) opinion addressing the issues raised in the untimely Rule 1925(b) Concise Statement. **See id.** Following the remand, this Court affirmed Gad's judgment of sentence on January 11, 2019. **See Commonwealth v. Gad**, 209 A.3d 495 (Pa. Super.

---

[2] **See** 18 Pa.C.S.A. §§ 4902(a), 902(a), 4952(a)(2).

- 2 -

2019) (unpublished memorandum). Gad did not seek allowance of appeal with the Pennsylvania Supreme Court.

On March 18, 2019, Gad, *pro se*, filed the instant, timely PCRA Petition. The PCRA court appointed Gad counsel. PCRA counsel sought permission to withdraw from representation, citing a conflict of interest. The PCRA court permitted counsel to withdraw, and appointed Gad new PCRA counsel. Counsel filed an Amended PCRA Petition on Gad's behalf, raising claims of ineffective assistance of counsel. The PCRA court conducted hearings on October 24, 2019, November 26, 2019, and December 31, 2019.[3] On February 12, 2020, the PCRA court entered an Order denying Gad's PCRA Petition. Gad filed a timely Notice of Appeal and a court-ordered Pa.R.A.P. 1925(b) Concise Statement.

Gad now raises the following issues for our review:

A. Did the [PCRA c]ourt err in finding that Attorney Connell was not ineffective in advising [Gad] not to testify?

B. Did the [PCRA c]ourt err in finding that Attorney Connell was not ineffective for failing to play additional prison telephone calls between [Gad] and [Fisher]?

C. Did the [PCRA c]ourt err in finding that Attorney Connell was not ineffective for failing to introduce text messages sent to [Gad] by his wife, [] Fisher[?]

Brief for Appellant at 4.

---

[3] The PCRA hearing was recessed on both October 24, 2019, and November 26, 2019, as a result of Gad's "repeated outbursts in the courtroom." PCRA Court Order, 2/12/20, at 2.

This Court examines PCRA appeals in the light most favorable to the prevailing party at the PCRA level. Our review is limited to the findings of the PCRA court and the evidence of record. Additionally, we grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. In this respect, we will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error. However, we afford no deference to its legal conclusions.

**Commonwealth v. Henkle**, 90 A.3d 16, 20 (Pa. Super. 2014) (citations, quotation marks and brackets omitted).

Each of Gad's claims challenges the effectiveness of Attorney Connell's representation during Gad's trial.

It is well-settled that counsel is presumed to have been ineffective and that the petitioner bears the burden of proving counsel's alleged ineffectiveness. To overcome this presumption, a petitioner must establish that: (1) the underlying substantive claim has arguable merit; (2) counsel did not have a reasonable basis for his or her act or omission; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance, that is, a reasonable probability that but for counsel's act or omission, the outcome of the proceeding would have been different. A PCRA petitioner must address each of these prongs on appeal. A petitioner's failure to satisfy any prong of this test is fatal to the claim.

**Commonwealth v. Wholaver**, 177 A.3d 136, 144 (Pa. 2018) (citations, quotation marks omitted).

In his first claim, Gad asserts that Attorney Connell was ineffective for advising him not to testify during his trial. Brief for Appellant at 14. According to Gad, his "testimony would have directly disputed the Commonwealth's contention that he had intimidated [Fisher] or asked her to lie for him." **Id.** at 15. Gad claims that Attorney Connell failed to offer a strategic basis for

advising Gad not to testify, beyond his propensity for outbursts. *Id.* Gad argues that he was prejudiced, because the jury did not have the opportunity to hear a "counter-narrative of the case…." *Id.* at 16.

> The decision of whether or not to testify on one's own behalf is ultimately to be made by the defendant after full consultation with counsel. In order to sustain a claim that counsel was ineffective for failing to advise the appellant of his rights in this regard, the appellant must demonstrate either that counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf.

*Commonwealth v. Michaud*, 70 A.3d 862, 869 (Pa. Super. 2013) (citation omitted).

In its Order, the PCRA court summarized the relevant testimony from the PCRA hearing, addressed Gad's claim, and concluded that it lacks merit. *See* PCRA Court Order, 2/12/20, at 4-7. Specifically, the PCRA court concluded that Gad knowingly and intelligently waived his right to testify after consultation with Attorney Connell. *Id.* at 4 (citing *Commonwealth v. Rigg*, 84 A.3d 1080, 1086 (Pa. Super. 2014) (stating that "where a defendant voluntarily waives his right to testify after a colloquy, he generally cannot argue that trial counsel was ineffective in failing to call him to the stand.")). Further, the PCRA court highlighted Attorney Connell's concern that Gad's testimony could open the door to evidence of Gad's prior conviction of witness intimidation, noting that his prior case involved "intimidat[ing] a complainant who had initially accused him of domestic violence into recanting—the same type of conduct for which he was accused of … in the present case." PCRA

Court Opinion, 2/12/20, at 7. The PCRA court's determination is supported by the record and free of legal error. We therefore affirm on the basis of its reasoning, as set forth in its Order, in denying Gad's first claim. *See* PCRA Court Order, 2/12/20, at 4-7.

In his second claim, Gad contends that Attorney Connell was ineffective for failing to play recordings of prison phone calls between him and Fisher. Brief for Appellant at 16. Gad claims that, in one of the phone calls, Fisher agreed with Gad's statement that Gad had not assaulted her. *Id.*; *see also id.* at 18 (arguing that in a June 21, 2017, call, "Fisher clearly denied that Gad struck her and explains that her children put her up to falsely accusing Gad."). According to Gad, the prison calls presented by the Commonwealth, without further context, "were intended to paint Gad in an unflattering light, [and] the jurors may well have been left with the impression that Gad was pressuring Fisher to lie for him." *Id.* at 17. Gad claims that Attorney Connell had no reasonable basis for failing to introduce these calls, and that their introduction would have resulted in an acquittal. *Id.* 18-19.[4]

In its Order, the PCRA court reviewed call transcripts, thoroughly addressed Gad's second claim, and concluded that Gad was not prejudiced by counsel's failure to introduce the complete prison call tapes. *See* PCRA Court

---

[4] We observe that Gad failed to include any citations to or discussion of relevant legal authority in support of his claim. *See* Pa.R.A.P. 2119(a) (providing that the argument shall include "such discussion and citation of authorities as are deemed pertinent.").

Order, 2/12/20, at 7-17. The PCRA court stated that "[t]hese exhibits tend to prove nothing more than that [] Fisher told [Gad] that she made or would make certain statements to the prosecuting attorney and [c]ourt that contradicted her prior allegations of abuse." **Id.** at 10. The PCRA court's determination is supported by the evidence of record and is free of legal error. Thus, we affirm on the basis of its thorough and well-reasoned Order in rejecting Gad's second claim. **See id.** at 7-17.

In his final claim, Gad argues that Attorney Connell was ineffective for failing to introduce text messages between Gad and Fisher. Brief for Appellant at 19-20. According to Gad, the text messages would support his claim that Fisher was not pressured or intimidated into providing false testimony, or refusing to testify. **Id.** at 20. Gad points out that Attorney Connell acknowledged that one text message may have been helpful to the defense, and argues that Attorney Connell could have no reasonable strategic basis for failing to introduce the text messages. **Id.** at 21. Gad also claims that he was prejudiced by Attorney Connell's failure to introduce exculpatory evidence. **Id.**[5]

In its Order, the PCRA court set forth the relevant law, addressed Gad's claim, and concluded that it lacks merit. **See** PCRA Court Opinion, 2/12/20, at 17-23. The PCRA court specifically notes that it is unclear whether the text

_____

[5] Again, Gad has failed to support his claim with citation to and discussion of relevant legal authority. **See** Pa.R.A.P. 2119(a).

- 7 -

messages could have been properly authenticated for admission at trial. *Id.* at 19-20. The PCRA court nevertheless concluded that, even if all of the text messages had been admitted at trial, Gad failed to establish that their admission would have resulted in a more favorable outcome. *Id.* at 20-23. The court emphasized that significant credible testimony supported Gad's convictions. *Id.* at 22-23. The PCRA court's determinations are supported by the record and free of legal error, and we affirm on the basis of its Order regarding Gad's final claim. *See id.* at 17-23.

Accordingly, we affirm the Order of the PCRA court denying Gad's first PCRA Petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/25/20

**IN THE COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY**
**COMMONWEALTH OF PENNSYLVANIA**
**CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA :
                                  :       **No. CP-48-CR-03404-2017**

v.                                :

AHMED GAD,                     :

               **Defendant.**        :

2020 FEB 12 PM 1:34
CLERK OF COMMON PLEAS
CRIMINAL DIVISION
NORTHAMPTON COUNTY.PA
FILED

## ORDER OF COURT

**AND NOW**, this 12th day of February 2020, upon consideration of Defendant's Amended Petition for Post-Conviction Relief, and the Commonwealth's response thereto, and following a hearing, it is hereby **ORDERED** that the petition is **DENIED**.

## STATEMENT OF REASONS

Defendant Ahmed Gad (Defendant) was convicted herein on February 26, 2018 of the offenses of perjury – 18 Pa.C.S. § 4902(a), solicitation to commit perjury – 18 Pa.C.S. § 902(a), and intimidation of a witness – 18 Pa.C.S. § 4952(a)(2). Each of these charges arose from the Defendant's conduct in connection with case number CP-48-CR-03326-2016, wherein he was charged with and convicted of simple assault and harassment. Defendant was convicted of those charges on June 6, 2017. His conviction and sentence were affirmed on June 11, 2018. The charges in that earlier case arose from Defendant's conduct in assaulting his wife, Eva Fisher. Prior to the trial of that case, Defendant both intimidated Ms. Fisher in an effort to persuade her to commit perjury by testifying falsely that Defendant did not assault her, and occasioned her absence from the first trial. In addition, the Defendant committed perjury at his



first trial by testifying that he did not know Ms. Fisher's whereabouts, when in fact he knew precisely where she was and had occasioned her absence from trial, and by falsely testifying that he did not assault Ms. Fisher. As a result of that conduct, Defendant was charged with the offenses herein. As noted above, Defendant was convicted of those charges on February 26, 2018. His conviction and sentence were affirmed January 11, 2019.

Presently before the Court is Defendant's Amended Petition for Post-Conviction Relief, filed September 3, 2019. Defendant initially filed a *pro se* petition for collateral relief on March 18, 2019 and was appointed conflicts counsel. After a change in appointed counsel due to a conflict of interest, present counsel filed the instant amended petition. A hearing was held on the amended petition, commencing October 24, 2019. Because of Defendant's repeated outbursts in the courtroom, the hearing was recessed and then reconvened on November 26, 2019. For the same reason, the hearing was recessed a second time, and ultimately concluded on December 31, 2019. Both parties were given an opportunity to file briefs in support of their respective petitions, and the matter is now ready for disposition. We note that while Defendant's amended petition sets forth seven bases for relief, he indicates in his brief that he is withdrawing the latter four claims from consideration. Accordingly, we address herein only the first three claims raised in the amended petition.

I.      **Trial counsel was not ineffective in advising Defendant not to testify at trial. Having been properly advised, Defendant chose to waive that right.**

The first claim raised by Defendant in his amended petition is a contention that trial counsel James Connell, Esq. "was ineffective for failing to advise Defendant that it would be in his interest to testify at trial and was further ineffective for pressuring Defendant not to

testify at trial." (Amended Petition, ¶11a). We note first that counsel is presumed to be effective. *Commonwealth v. Breakiron*, 729 A.2d 1088 (Pa. 1999). In order to overcome this presumption and obtain relief on the basis of his claim, the Defendant is required to prove, by a preponderance of the evidence, that his conviction resulted from "[i]neffective assistance of counsel which, in the circumstances of [this] particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). In disposing of such a claim, we are required to apply a three-prong performance and prejudice test, evaluating (1) whether Defendant has proven that the issue underlying his claim of ineffectiveness has arguable merit, (2) whether Defendant has proven that counsel's act or omission lacked any reasonable basis, and (3) whether the Defendant has proven that he was prejudiced by counsel's act or omission. *Commonwealth v. Pierce*, 542 A.2d 973 (Pa. 1987). If Defendant fails to meet his burden on any one of these prongs, his claim for relief must fail. *Id.* Because we find that Defendant has failed to meet his burden with respect to the first issue in his amended petition, his request for relief on this basis must fail.

Clearly, the first issue raised in Defendant's amended petition implicates his constitutional right to due process.

> The right of an accused to testify on his own behalf is a fundamental tenet of American jurisprudence and is explicitly guaranteed by Article I, Section 9 of the Pennsylvania Constitution. [...] The right to testify on one's own behalf at a criminal trial has sources in several provisions of the [U.S.] Constitution. It is one of the rights that are essential to due process of law in a fair adversary process. The necessary ingredients of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony.

*Commonwealth v. Baldwin*, 8 A.3d 901, 903 (Pa. Super. 2010) (internal citations omitted). Thus, if Defendant had indeed been deprived of his right to testify on his own behalf, we believe that the issue underlying his first claim of ineffective assistance of counsel would have arguable merit. However, the record does not reflect that Defendant was deprived of this right. Rather, the record reflects that Defendant made a knowing and intelligent waiver of this right after consultation with counsel. "[W]here a defendant voluntarily waives his right to testify after a colloquy, he generally cannot argue that trial counsel was ineffective in failing to call him to the stand." *Commonwealth v. Rigg*, 84 A.3d 1080 (Pa. Super. 2014).

At trial, on February 27, 2018, Defendant was given an opportunity to testify and ultimately elected not to do so. Prior to resting his defense, Attorney Connell colloquied the Defendant on the record, and stated that he had advised his client not to testify. N.T. 2/27/18, pp.169-171. The Court also colloquied the Defendant about testifying. *Id.* Notably, the Court twice expressly stated to the Defendant that while he was wise to consider the advice of his counsel, it was ultimately his decision whether or not to testify. During this colloquy, Defendant expressed that he wished to testify, and that he had "a lot to say," but that he was accepting the advice of his counsel in not testifying. *Id.* at 170. The desire to testify and the knowing and intelligent decision not to do so, based upon the learned counsel of one's attorney, are not mutually exclusive. Moreover, the decision to suppress one's impulses and to follow the advice of one's counsel does not render the decision unknowing or unintelligent. "In order to sustain a claim that counsel was ineffective for failing to advise [the Defendant] of his right" to testify, he "must demonstrate either that counsel interfered with his right to testify, or that

Page 4 of 24

counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf." *Commonwealth v. Nieves*, 746 A.2d 1102 (Pa. 2000). The record here does not reflect that either of these circumstances was present at Defendant's trial.

Again, Defendant was given the opportunity at trial to testify. While counsel advised him not to, and Defendant ultimately chose to follow that advice, the mere act of advising Defendant not to testify did not amount to an interference with the right to testify – the record of the trial makes clear that Defendant was given an opportunity to take the stand. Furthermore, Defendant's own testimony at the November 26, 2019 hearing reflects only that Defendant *wanted* to say his piece at trial, but that he instead *chose* to follow his counsel's advice. N.T. 11/26/19, p.20. Notably, Defendant testified at the hearing that Attorney Connell had never suggested to him prior to trial that he not testify. *Id*. at 20-24. While Defendant did testify at the hearing that Attorney Connell told him at trial "to shut up," it is clear that Attorney Connell made this statement in an attempt to be able to hear what was taking place, in order that he could effectively represent the Defendant: "He told me [...] in the trial [...] if I listen to you, I'm not going to be able to listen to the other side, to leave me alone." *Id*. at 23.

Moreover, we cannot conclude that counsel's advice to Defendant on this issue was "so unreasonable as to vitiate a knowing and intelligent decision to testify." Attorney Connell was questioned at the October 24, 2019 and December 31, 2019 hearings with respect to this issue. Therein, Attorney Connell acknowledged that Defendant had wanted to testify at trial, that he advised Defendant not to do so, and that Defendant ultimately informed him that he would not testify. N.T. 10/24/19, p.8. With respect to his reasoning for this advice, Attorney Connell

testified that he believed the Defendant would have made a poor witness, for a variety of reasons. First, he testified that he was concerned about Defendant's demeanor, insofar as Defendant was verbally explosive, prone to outbursts, and "would say whatever he wanted to say, despite what the question would be." N.T. 12/31/19, pp.34-35. The validity of this concern is borne out in the transcript of every proceeding involving this Defendant, including the mere fact that the hearing on the instant amended petition was recessed twice because of Defendant's behavior. As Defendant's present counsel mildly phrases it in his brief, Defendant is prone to "inappropriate exuberance." (Def. Brief, p.6). Such a concern – that a Defendant would make a poor witness – is a valid basis for advising him not to testify. See Commonwealth v. Smith, 181 A.3d 1168 (Pa. Super. 2018) (finding that counsel was not ineffective for advising the defendant not to testify, where counsel indicated: "I informed him and thought he would not make a good witness. In my judgment in talking with him on multiple occasions at the jail, he was not a good communicator. He was not a good speaker. And it would affect his credibility. He speaks very fast. He has trouble staying on track.")

In addition, Attorney Connell was concerned that Defendant would not hold up on cross-examination. First, Attorney Connell was concerned that Defendant would subject himself to cross-examination about his *crimen falsi* record, consisting of a conviction in Lehigh County for intimidation of a witness. N.T. 12/31/19, pp.35-36. This was a valid concern, as the Commonwealth could have properly impeached the Defendant on this issue. Pa.R.E. 609. Cf. Nieves, 746 A.2d at 1105 (finding that counsel was unreasonable in advising his client not to testify because of his criminal record, where his prior convictions were not for crimes

involving dishonesty or false statement). Furthermore, counsel was concerned that, given Defendant's inability to keep his responses to questions succinct, Defendant would open the door to the facts underlying his prior conviction for intimidation of a witness. N.T. 12/31/19, pp.34-36. In that Lehigh County case, the Defendant had intimidated a complainant who had initially accused him of domestic violence into recanting – the same type of conduct for which he was accused of perjury and witness intimidation charges in the present case. Given the relatedness of the conduct between his past conduct and present charges, Attorney Connell did not think it would be prudent for the Defendant to testify, given the risk of this damaging evidence coming in through Defendant's own words. Whereas we find that all of these concerns were reasonable, we do not conclude that Attorney Connell was unreasonable in advising the Defendant not to testify.

Whereas we conclude that Attorney Connell neither interfered with Defendant's right to testify nor gave him unreasonable advice not to do so, we do not conclude that there is any merit to Defendant's contention that he was deprived of his constitutional right to testify by any ineffectiveness on the part of counsel. Moreover, we find that Attorney Connell had an entirely reasonable basis for advising the Defendant as he did. Accordingly, we must conclude that Defendant is entitled to no relief on his first claim.

II.     **Defendant was not prejudiced by trial counsel's failure to play for the jury additional portions of recorded prison phone calls.**

In his next claim for relief, Defendant contends that "Attorney Connell was ineffective for failing to play portions of the prison phone call recordings between Defendant and his wife [...] that were of an exculpatory or non-incriminating nature." (Amended Petition, ¶11b).

Specifically, Defendant contends that Attorney Connell should have played for the jury certain additional portions of the audio recording of his prison phone calls to Eva Fisher, from June 14, 2017 and June 21, 2017. Those portions of the phone calls at issue are memorialized in transcripts submitted as Defendant's Exhibits 6 and 7 at the November 26, 2019 hearing. The audio recording of those calls was also submitted on a thumb drive as Defendant's Exhibit 2 at the hearing. Having reviewed both the transcripts and audio offered by the Defendant, we cannot conclude that there is a reasonable probability that the admission of this evidence at trial would have altered the outcome thereof.

Defendant's Exhibit 6 is a transcript of an excerpt of a June 14, 2017 phone call from Defendant, in the Northampton County Prison, to Ms. Fisher. In that transcript, Defendant questions Ms. Fisher about what she stated to the prosecutor when she recently spoke to him. Ms. Fisher tells Defendant that she told the prosecutor that Defendant had not hit her, but rather that she had had a seizure on the date of the accused assault. (Def. Ex. 6, p.2). Defendant then appears to interject to correct Ms. Fisher's statement about why she did not go to the hospital on that occasion. *Id.* at pp.2-3. Ms. Fisher then goes on, in this brief excerpt, to state: "I told him I hit my head, so I'm gonna go against what I'm saying," and "We're not supposed to talk about this stuff on the phone." *Id.* at pp.3, 5. We note that, in reviewing the audio of this call excerpt, as part of Defendant's Exhibit 2, we found that the tenor of the conversation is clearly one of hostile questioning by the Defendant.

Defendant's Exhibit 7 is a transcript of a full call on June 21, 2017 from Defendant, in the Northampton County Prison, to Ms. Fisher. In that call, Defendant questions Ms. Fisher

repeatedly about what she stated to the prosecutor that day in a meeting, attempting to ensure that she told the prosecutor that she had had a seizure on the date in question, that Defendant did not hit her, and that this entire case arose because he was being harassed by his former paramour, Maryam Ezzat, who had testified at the 2017 trial. Of particular note in that call were the following two exchanges that demonstrate Defendant's attempts to control what Ms. Fisher was saying to others:

| | |
|---|---|
| Defendant: | But you make sure that you tell them that I – I didn't go – I didn't put my hand on you. You made sure from that, right? |
| Ms. Fisher: | Yes, I made sure from that. |
| Defendant: | You swear to God? |
| Ms. Fisher: | I swear to God. |
| Defendant: | Okay. Good. Good. |

\*   \*   \*   \*   \*   \*   \*   \*   \*

| | |
|---|---|
| Defendant: | You went to see your sister again yesterday? |
| Ms. Fisher: | (Unintelligible). Yes. |
| Defendant: | Okay. Who talked to you? |
| Ms. Fisher: | Jessica. |
| Defendant: | Jessica talked to you? |
| Ms. Fisher: | Yes. |
| Defendant: | Okay. And she can – she told you that – through your stuff and they do that to you? |
| Ms. Fisher: | Yes. |
| Defendant: | Okay. Did you see your son? (Unintelligible) see your son? |
| Ms. Fisher: | No. |
| Defendant: | You didn't see them? |
| Ms. Fisher: | No. |
| Defendant: | You sure? |
| Ms. Fisher: | Yes, I'm sure. |
| Defendant: | You swear to God you didn't see them? |
| Ms. Fisher: | I swear to God I haven't seen my son. I haven't even seen my mother. |
| Defendant: | You didn't talk to them? |
| Ms. Fisher: | No. The last person – |
| Defendant: | Okay. |
| Ms. Fisher: | – I spoke to was Jessica. |

| Defendant: | Okay. Good. I don't want you to talk – she knows your phone number? Anybody knows your phone number? |
| Ms. Fisher: | Okay. |
| Defendant: | Okay. Whatever you want to do, just be careful. I don't want you to contact them because this contact – this causes trouble between me and you, and you know that, right? |
| Ms. Fisher: | I know that. Yes, I know that. |
| Defendant: | So I don't want you to contact them, please. If you want our lives to go back – |
| Ms. Fisher: | I know that. |
| Defendant: | – together, just keep it me and you. Just me and you. Stay away from anybody. |
| Ms. Fisher: | I know that. |

Def. Ex. 7, pp.13-14, 18-20.

The Court acknowledges that something is lost in a cold reading of the transcript of the call, and again note that in reviewing the audio version of that call, as part of Defendant's Exhibit 2, we found that the tone of Defendant's questioning was hostile and frenetic, and could be characterized as aggressive or ranting.

Having considered Defendant's Exhibits 2, 6, and 7, as well as the trial testimony and exhibits, we cannot conclude that there is a reasonable probability that the introduction of this evidence would have altered the outcome of the trial. These exhibits tend to prove nothing more than that Ms. Fisher told the Defendant that she made or would make certain statements to the prosecuting attorney and Court that contradicted her prior allegations of abuse. Evidence to that effect was already presented at trial, through excerpts from numerous phone calls in which Ms. Fisher is heard agreeing, at Defendant's insistence, that she will make certain statements regarding what took place on the occasion of the charged assault.

In those calls, Defendant alternatively instructs Ms. Fisher about what to say to law enforecement authorities – relating multiple inconsistent versions of events – and about avoiding contact with friends and family. In one exchange, Defendant instructs Ms. Fisher to tell the prosecutor that she did not come to Defendant's 2017 trial because she does not drive or have a car, and that she was not aware of the subpoena. N.T. 2/27/18, pp.108-109. In an excerpt from a June 12, 2017 call, the following exchange was heard, in which Defendant clearly instructs Ms. Fisher in a menacing manner, warning her not to speak to anyone, even her family, and telling her to tell the prosecutor that she had had a seizure and made up the accusations of abuse because she was angry at the Defendant for speaking to another woman:

| | |
|---|---|
| Defendant: | Okay. He will ask you if I did put my hand on you or something. Tell him when you came to him that it was over jealousy and stupidity for me and from you. But I never put – tell him the truth that I never put my hands on you, okay? Do you understand what I mean? |
| Ms. Fisher: | Okay. Yes. |
| Defendant: | That you was confused, you had seizure. And it said in the paper that you had seizures. That was not from him. I was mad at him because he was talking to any girl or whatever, whatever. I was – that you were thinking, oh, tell him truth, okay, what you told me, okay? |
| Ms. Fisher: | Um-hum. |
| Defendant: | So that they can understand that this is all stupidity and that's their mistake. It's not me or you, okay? |
| Ms. Fisher: | Um-hum. |
| Defendant: | Okay. If you can. Another thing I want you to do something. Listen to me. Listen to me very carefully. Okay? Listen. |
| Ms. Fisher: | Uh-huh. |
| Defendant: | I – I will forget everything between me and you when I get out because I love you. But you have to listen to me very carefully. If I get out, if I get out, if God willing, Insha'Allah, if I get out from this place and I know that you talk to anybody, or anybody knows your phone number or anybody came to my apartment, or you |

|              |                                                                                                                                                                                                                                                                                 |
| ------------ | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|              | went to anybody and talk to him behind my back, like I was talking to you before, there is no excuse, Eva, okay?                                                                                                                                                                                 |
| Ms. Fisher:  | Um-hum.                                                                                                                                                                                                                                                                                          |
| Defendant:   | This is not going to be worth it, Eva.                                                                                                                                                                                                                                                          |
| Ms. Fisher:  | I know that.                                                                                                                                                                                                                                                                                    |
| Defendant:   | Okay?                                                                                                                                                                                                                                                                                           |
| Ms. Fisher:  | I'm not stupid.                                                                                                                                                                                                                                                                                 |
| Defendant:   | So nobody you will be able to talk to except in front of me. Like you know when – when – when that happened behind my back what happens. I'm in jail right now, right? And you are by yourself.                                                                                                   |
| Ms. Fisher:  | Yes.                                                                                                                                                                                                                                                                                            |
| Defendant:   | I don't know what you're going to be able to do by yourself. I don't know if I take long in jail what's going to happen. I don't know. So if I want to fix my life between me and you, I have to know everything. If you – I already told you that before I went to jail, before I gone to jail. So if you want to be with me, you have to understand that there's nothing – nobody supposed to know your number, you're not supposed to talk to nobody behind my back, you're not supposed to talk to nobody. And nobody come to your home or you go to take your check or your marriage certificate, just go, but there's nobody except your sisters. Just take them and leave. You got me? |
| Ms. Fisher:  | Um-hum. Yeah, I know.                                                                                                                                                                                                                                                                           |
| Defendant:   | You got me?                                                                                                                                                                                                                                                                                     |
| Ms. Fisher:  | Yes, I got you.                                                                                                                                                                                                                                                                                 |
| Defendant:   | Okay. If you – if you disagree with that and you don't like it, it's your freedom. But don't trick me. Don't do something behind my back. You tell me I'm not agree with that. You got me?                                                                                                        |
| Ms. Fisher:  | I understand all that.                                                                                                                                                                                                                                                                          |
| Defendant:   | Okay. Did you talk to your family or to anybody while I'm in jail?                                                                                                                                                                                                                              |
| Ms. Fisher:  | No.                                                                                                                                                                                                                                                                                             |
| Defendant:   | Are you sure?                                                                                                                                                                                                                                                                                   |
| Ms. Fisher:  | No.                                                                                                                                                                                                                                                                                             |
| Defendant:   | You didn't talk to nobody, nobody knows your number?                                                                                                                                                                                                                                            |
| Ms. Fisher:  | Nobody knows my number.                                                                                                                                                                                                                                                                         |
| Defendant:   | Okay. Good.                                                                                                                                                                                                                                                                                     |

N.T. 2/27/18, pp.110-113. In another call, on June 20, 2017, Defendant is heard aggressively

instructing Ms. Fisher, telling her that she imagined everything:

| | |
|---|---|
| Defendant: | So I think you that think that I put my hands on you because when you wake up from this seizure you find that, and when you find that, you thought because of the argument, you thought that I put my hands on you. Do you understand me? |
| Ms. Fisher: | Yeah. |
| Defendant: | And I never put my hands on you. I know – I don't know why you – you said that on the court, you said that I put my hand on you for six months. I don't know – I think you mean we were argument for six months, right? You – |
| Ms. Fisher: | Um-hum, yes. |
| Defendant: | – don't mean that I put my hand on you, you just mean we were argument, right? |
| Ms. Fisher: | Yes. |
| Defendant: | Okay. Try to explain that to him that this is what you imagined, which is not true because of the seizure or because of your mind was not properly right, okay? |
| Ms. Fisher: | Uh-huh. |
| Defendant: | Because they couldn't – if they cannot understand that, I can stay here for a year, you know that, because I took it to trial. Some people say they can give you the maximum. They can let you here for a year. |
| Ms. Fisher: | Um-hum. |
| Defendant: | So you have to explain that very well to him, Eva, okay? |
| Ms. Fisher: | Yeah, I know. |
| Defendant: | That this is all imagination because of your seizure. And I didn't put my hands on you. I just hugged you and I put you on the couch and I left for my work. But maybe you imagine because we were in argument because of this shit and because of this court and we came back. If they took blood – when you went to the – when you went to the hospital, did they took any blood from you, or was – |
| Ms. Fisher: | No. |
| Defendant: | I don't think they can do anything for you, because you're sick. You have a seizure and you wasn't doing right. You're sick. |
| Ms. Fisher: | Um-hum. |
| Defendant: | Do you understand me? |
| Ms. Fisher: | Yeah. |
| Defendant: | That's – that's all I – I want to tell you. And so when you go to him tomorrow tell them that you were sick. You have seizures. |
| Ms. Fisher: | Um-hum. Right. |
| Defendant: | And you imagined that. You think that because we got in argument and you don't know what happened, which I put you – |

> what happened is I hug you and I put you on the couch. And when you calm down I left, but I don't know what happened after that. Maybe you got another seizure. Maybe you stretch again. Maybe you fall from the couch. I don't know. I don't think you know either because you wasn't – you was unconscious. So you imagined.
>
> Ms. Fisher:    Um-hum.
>
> Defendant:    This all imagine. We were in argument for six months, not fighting. We were in argument.

N.T. 2/27/18, pp.117-120. Notably, in Defendant's Exhibits 2 and 6, Ms. Fisher is heard the following day confirming to the Defendant that she told the prosecutor that she had had a seizure on the date of the assault. Furthermore, as noted above in Defendant's Exhibits 2 and 7, Defendant is heard again questioning Ms. Fisher aggressively on June 21, 2017 about whether she had seen or spoken to any of her family.

In yet another call, on July 22, 2017, Defendant concocts another tale, this time appearing to acknowledge physical contact, asserting that it was unintentional and directing Ms. Fisher to make such a statement to the Court:

> Defendant:    You coming tomorrow [to my sentencing], right? It's 9 o'clock, right?
>
> Ms. Fisher:    Yeah, um-hum.
>
> Defendant:    Okay. Listen, I want you to do that. When we came from the – when we came from the – from the – from the whatever court, from the harassment for this mother fucker, we were arguing and, you know, that's what happened, right? So we were arguing, and in the same time I told you to stay away from me, I was moving my hand and you was moving in the same time so I touch you by mistake. I didn't mean to put my hand on you. Do you understand what I mean?
>
> Ms. Fisher:    Um-hum.
>
> Defendant:    I didn't mean to put my hand on you. You was moving and I was moving my hand. I didn't mean to do it. It touched you by mistake. Okay. And I explain that to you later when – when we

Ms. Fisher:  met, but in the time you did the report, you didn't know that it's mistake, but I did explain to you that. Do you understand me? Um-hum.

\* \* \* \* \* \* \* \*

Defendant:  I want you to take the stand and – and testify with that. And when they tell you – listen very carefully, please, Eva. This is not willful, not intentional. I was moving my hand and you was moving in the same time. I touched you by mistake. Also if they ask you, did he put you his hand any time before then, tell them, no, I never put my hand on you. You know that, I never put my hand on you, right? You know that this all cause this problem and this stupidity.

N.T. 2/27/18, pp.127-128, 129-130.

After these exchanges were played by the Commonwealth at trial, however, Ms. Fisher

testified that the versions of events suggested by the Defendant in those calls were not accurate:

Q:  He says he wants you to come to his sentencing and say he did not hit you. Is that true that he did not hit you?
A:  No, he hit me.

N.T. 2/26/18, p.95.

Q:  And did you have a seizure and fall off the couch; is that true?
A:  No.
Q:  And when you say – when he says explain that to him, who is he referring to when he says explain that to him?
A:  To you.
Q:  And when he mentions that you were in an argument for six months, not fighting, what is he talking about?
A:  He's trying to make it seem like he never hit me.
Q:  Is that true?
A:  No, he did it all the time.

N.T. 2/27/18, p.121.

Q:  Is it true that this was unintentional?
A:  No.

Q: Is it true that he touched you by mistake?
A: No.
Q: Is it true that it was an accident.
A: No.

N.T. 2/267/18, p.132.

Moreover, Ms. Fisher credibly testified at trial that Defendant did, in fact, strike her in September 2016, and that Defendant had instructed her prior to his 2017 trial to claim that her injuries were the result of a seizure:

Q: Can you tell the jury in your own words what happened on that date?
A: We were arguing and he smacked me two times in my face and he told me that he was staying home from work and I was terrified. I was afraid he would have killed me that day if he would have stayed home.

N.T. 2/26/18, p.71.

Q: On the day of the [2017] trial, did you talk to the Defendant on the phone before trial began?
A: Yes.
Q: Can you tell the jury about that conversation?
A: He had called me. He had said that he wanted me to have a conversation with his attorney.
Q: Okay.
A: And then he called me back, and I never heard from his attorney ask me any questions. He asked me questions.
Q: He being the Defendant?
A: Yes.
Q: What kind of questions did he ask you?
A: He asked me if I was all right. And – he said to tell them that you had a seizure, which I never had a seizure.
Q: When you say you never had a seizure, are you talking about on the date of the assault?
A: Yes. My last seizure was in 2012.

N.T. 2/26/18, p.80.

In essence, the evidence proffered by the Defendant in connection with this petition is not materially different from that offered by the Commonwealth in its case-in-chief at trial. In no way do Defendant's Exhibits 2, 6, and 7 point to a conclusion different from that already reached by the jury. Rather, these exhibits simply confirm that Ms. Fisher complied with Defendant's demands and made certain false statements to the prosecutor regarding what took place on the date of the assault at issue. Accordingly, we cannot conclude that Defendant was prejudiced by Attorney Connell's failure to present the evidence now proffered, and his petition must be denied in this regard.

### III. Defendant was not prejudiced by trial counsel's failure to proffer certain text messages as evidence at trial.

Defendant's third and final claim for relief is a contention that "Attorney Connell was ineffective for failing to obtain text messages sent by Defendant's wife to Defendant that were in the possession of Defendant's prior counsel, [...] reflecting threats made by Defendant's wife against Defendant." (Amended Petition, ¶11c). Because we find that Defendant was not prejudiced by counsel's omission, this claim must be denied.

The messages at issue are found in Defendant's Exhibit 3, which was introduced at the October 24, 2019 hearing on Defendant's petition, consisting of eleven pages. We note that the first page is a screenshot showing four incoming calls on October 15, 2016 from a number designated by the recipient as "Eva Fisher," that the last two pages are screenshots of text messages sent from one cell phone to another – one sender is identified by a phone number, and the other sender was designated by the recipient as "Eva New" – and that the remainder of the pages appear to be screenshots of messages from an online instant messaging platform.

Page 17 of 24

It is Defendant's contention that Attorney Connell was ineffective insofar as he failed to obtain these documents from the file of Philip Viglione, Esq., who had represented Defendant in the underlying assault case in 2017. Defendant contends that the messages, which he contends were sent to him by Ms. Fisher, demonstrate that he did not assault Ms. Fisher and therefore did not perjure himself at his first trial or solicit perjury by attempting to persuade Ms. Fisher to testify that he had not assaulted her.

For his part, Attorney Connell testified at the hearing that Defendant had made him aware of the existence of these messages. N.T. 10/24/19, pp.20-21. While present counsel represented to the Court at the hearing that he had obtained Defendant's Exhibit 3 from Attorney Viglione's file in the Public Defender's Office, Attorney Connell testified that he did not find those documents in the file, and therefore did not review them prior to trial or consider introducing them. *Id.* at pp.22-24. Assuming arguendo that the documents were in Attorney Viglione's file, and that Attorney Connell failed to find them there, we nevertheless find that Defendant is entitled to no relief, as he was not prejudiced by their omission.

In order for Defendant to demonstrate that he was prejudiced by Attorney Connell's failure to present the proffered messages, he must prove that, "but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different." *Commonwealth v. Kimball*, 724 A.2d 326, 333 (Pa. 1999). Stated another way, we must examine the proffered evidence and determine "whether the nature and quality of the evidence is such that there is a reasonable probability that the jury would have credited it and rendered a more favorable verdict." *Commonwealth v. Johnson*, 966 A.2d 523, 542 (Pa. 2009).

"A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." *Commonwealth v. Laird*, 119 A.3d 972, 978 (Pa. 2015). We emphasize that the question before us is not whether there is a *possibility* that the outcome of the trial would have been different had the evidence at issue been presented at trial, but whether a different outcome is *reasonably probable*. Having examined the messages proffered here in light of the balance of the evidence presented at trial, we find that our confidence in the outcome of the trial is in no way undermined.

Before any writing may be admitted into evidence at trial, it must be authenticated. Pennsylvania Rule of Evidence 901 provides: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."

> Text messages are documents and subject to the same requirements for authenticity as non-electronic documents generally. A document may be authenticated by direct proof, such as the testimony of a witness who saw the author sign the document, acknowledgment of execution by the signer, admission of authenticity by an adverse party, or proof that the document or its signature is in the purported author's handwriting. A document also may be authenticated by circumstantial evidence, a practice which is "uniformly recognized as permissible." [...] [T]he difficulty that frequently arises in e-mail and text message cases is establishing authorship. Often more than one person uses an e-mail address and accounts can be accessed without permission. In the majority of courts to have considered the question, the mere fact that an e-mail bears a particular e-mail address is inadequate to authenticate the identity of the author; typically, courts demand additional evidence. Text messages are somewhat different in that they are intrinsic to the cell phones in which they are stored. While e-mails and instant messages can be sent and received from any computer or smart phone, text messages are sent from the cellular phone bearing the telephone number identified in the text message and received on a phone associated with the number to which they are transmitted. The identifying information is contained in the text message on the cellular telephone. However,

as with e-mail accounts, cellular telephones are not always exclusively used by the person to whom the phone number is assigned.

*Commonwealth v. Koch*, 39 A.3d 996, 1004–05 (Pa. Super. 2011) (internal citations omitted).

Notably, the messages proffered in Defendant's Exhibit 3 lack any indication of when they were sent, rendering them irrelevant if not established to have been sent during the period at issue. While one of the text messages bears a sender's phone number that might have been established to be that of Ms. Fisher, the balance of the messages are instant messages – and one text message – that simply indicate that they were sent by the account of Eva Fisher. While there are some contextual clues in the messages indicating when they may have been sent, applying the considerations discussed by the *Koch* Court we would not have admitted the messages into evidence at trial had they been proffered without authentication testimony.

Given that the messages were purportedly sent from Ms. Fisher to Defendant, and there is no indication that any third party observed them being sent, only two persons could have possibly authenticated them – Ms. Fisher or the Defendant. Assuming arguendo that Ms. Fisher would have admitted to having authored the messages at issue, we are confident that the admission of those messages would not have altered the outcome of the trial.

The messages at issue appear on pages two through eleven of Defendant's Exhibit 3. Of those ten pages, only five contain statements that the Court may have considered admissible as relevant to this case, insofar as those statements appear to relate to the victim's accusations of assault and the Defendant's resulting 2017 trial. Those statements are found on the third, fourth, eighth, ninth, and eleventh pages of Defendant's Exhibit 3, and are as follows: "You have until we go to court to talk to me it's up to you[.] If you don't talk to me then you will

see me in court" (page 3); "Just so you know my son's [sic] planned all of this so that way I would not be with you" (page 4); "So I was right know [sic] you don't want me to call you[?] Right[?] That's ok because I can always change my mind[.] I have until you go to court[.] On December 8 at 9am" (page 8); "Oh just so you know that Steve from the d's [sic] office is coming to see me on Friday so thank you very much[.] I know what I will say[.] To him when he comes[.] For me to sign the papers" (page 9); "I am so sorry for hurting you I know that you didn't hit me I only said that because you didn't want to be with me no more" (page 11). Of those statements, only two – those on the fourth and eleventh pages – appear to actually contradict the testimony of Ms. Fisher with respect to the question of whether Defendant assaulted her. The balance of the statements appear only to circumstantially contradict the notion that Defendant committed the acts in question. Nevertheless, it is possible that all of these statements might have been admitted at trial for purposes of impeaching Ms. Fisher's testimony.

However, even if the Court had admitted all of Defendant's Exhibit 3 for impeachment purposes, the Court does not believe that there is any reasonable probability that the outcome of the trial would have been different. Rather, we believe that it is reasonably probable that said evidence would only have served to bolster the Commonwealth's evidence that Defendant had demanded that Ms. Fisher make certain statements in an effort to absolve him of the assault charges for which he was tried in 2017.

During the trial in the case before us now, Commonwealth witness Maryam Ezzat credibly testified as follows:

Q: Do you recall having any conversations with the Defendant about the assault case involving his wife from September 12th, 2016?

A: Yes, he called me and he text me.

Q: What did he tell you about that?

A: He told me that he is in trouble with the police because his wife – he hit his wife and she told the Court that she did get hit twice, and then he is in trouble again with her and he doesn't know what to do. He needs my help. I don't know.

Q: Okay. And while the case was pending, did the Defendant tell you of anything that he had told his wife to do?

A: Yes. He ask her to do – saying what he did to drop the charges and to write a note. First he ask her to text her to text him on his phone.

Q: What did he tell her to text him?

A: He told her to text him like a statement to show to his public defender, his lawyer.

Q: Okay.

A: And then after she did, he ask her to send it to him.

Q: A letter?

A: A letter by mail, after he didn't like just text on his phone, he wanted to have it by mail.

N.T. 2/27/18, pp.41-42.

We note that this testimony – demonstrating that Defendant had directed Ms. Fisher to make certain statements to him via text message to aid in avoiding the assault charges – would have been bolstered by the introduction of Defendant's Exhibit 3, given the fact that none of the pages of Defendant's Exhibit 3 depicts any *conversation* allegedly between Ms. Fisher and the Defendant. Rather, each merely demonstrates gratuitous statements allegedly made by Ms. Fisher to the Defendant.

Furthermore, Ms. Fisher herself credibly testified that the Defendant had directed her to make other written statements in advance of his 2017 trial, by threat of force:

Q: At some point did you mail the Defendant letters retracting your original account and asking the district attorney's office to drop the charges?

A: I didn't understand that.

Q: At some point after the September 12, 2016 incident, did the Defendant ask you to write a letter?

A: Yes.

Q: What did he tell you to write in that letter?

A: I don't remember exactly what he told me, but he told me what if I didn't do it, I would be in big trouble.

Q: What does that mean?

A: That means he would hit me if he saw me again.

N.T. 2/26/18, p.76.

allegations, and the exhibit now proffered by the Defendant, we cannot conclude that Defendant was prejudiced by Attorney Connell's failure to introduce that evidence. On balance, we believe it is highly unlikely that the jury would have credited Defendant's proffered evidence, concluded that Ms. Fisher and Ms. Ezzat were not truthful in their trial testimony, and rendered a not guilty verdict. Accordingly, Defendant's claim for relief on this point must fail.

Whereas we have concluded that none of Defendant's claims merit relief, his Amended Petition for Post-Conviction Relief must be denied.

BY THE COURT:

PAULA A. ROSCIOLI, J.